# RECORD NO. 15-1977

### In The

# United States Court Of Appeals
## For The Fourth Circuit

**M. L., a minor, by his parents and next friends,**
**Akiva and Shani Leiman; AKIVA LEIMAN; SHANI LEIMAN,**

*Plaintiffs – Appellants,*

**v.**

**LARRY A. BOWERS, in his official capacity as Interim**
**Superintendent; MONTGOMERY COUNTY BOARD OF**
**EDUCATION/MONTGOMERY COUNTY PUBLIC SCHOOLS,**

*Defendants – Appellees.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### AT GREENBELT

_____

### REPLY BRIEF OF APPELLANTS
_____

Michael J. Eig
Paula A. Rosenstock
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue, Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740

*Dated: April 26, 2016*                *Counsel for Appellants*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

## **TABLE OF CONTENTS**

**Page:**

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    APPELLEES SUGGEST AN IMPROPER STANDARD OF
      REVIEW.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   M.L.'S INDIVIDUAL NEEDS DRIVE HIS SPECIAL
      EDUCATION PROGRAMMING. . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.    Appellees Ignore M.L.'s Unique Needs, Including His
            Inability to Generalize. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.    The Curriculum Proposed for M.L. Necessitates
            the Incorporation of his Cultural/Religious
            Practice.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.  APPELLEES' PROPOSED ACCOMMODATIONS DO NOT
      PROVIDE M.L. THE EDUCATION TO WHICH HE IS
      ENTITLED.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV.   APPELLEES AND THEIR *AMICI* SWEEP TOO
      BROADLY: THE PROVISION OF RELEVANT
      SPECIAL EDUCATION TO A PROFOUNDLY
      DISABLED STUDENT DOES NOT THREATEN THE
      FABRIC OF THE FIRST AMENDMENT. . . . . . . . . . . . . . . . . . . 22

      A.    Invoking the First Amendment Does not Relieve
            the Requirement to Consider M.L.'s Individual
            Circumstances.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

i

B.     Stop the Parade: The Question of *How* to Effectively Provide M.L.'s Religious/Cultural Instruction is Independent From the Court's Obligation to First Determine M.L.'s *Need* for Such Instruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

V.     MCPS UNCONSTITUTIONALLY CONDITIONS THE PROVISION OF A FAPE ON M.L. AND HIS PARENTS FOREGOING THE PRACTICE OF THEIR RELIGION. . . . . . . . . 27

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ii

## TABLE OF AUTHORITIES

**Page(s):**

*A.B. ex rel. D.B. v. Lawson,*
    354 F.3d 315 (4th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Agostini v. Felton,*
    521 U.S. 203 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*AW ex rel. Wilson v. Fairfax Cty. Sch. Bd.,*
    372 F.3d 674 (4th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Board of Educ. of Kiryas Joel Village School Dist. v. Grumet,*
    512 U.S. 687 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Cty. Sch. Bd. of Henrico Cty., Virginia v. Z.P. ex rel. R.P.,*
    399 F.3d 298 (4th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 6

*Devine v. Indian River Cty. Sch. Bd.,*
    249 F.3d 1289 (11th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*G ex rel. RG v. Fort Bragg Dependent Sch.,*
    343 F.3d 295 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*J.P. ex rel. Peterson v. Cty. Sch. Bd. of Hanover Cty., Va.,*
    516 F.3d 254 (4th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*JH ex rel. JD v. Henrico County Sch. Bd.,*
    326 F.3d 560 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*JSK By & Through JK v. Hendry Cty. Sch. Bd.,*
    941 F.2d 1563 (11th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Lorenzen v. Montgomery Cty. Bd. of Educ.,*
    403 F. App'x 832 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*MM ex rel. DM v. School Dist.,*
    303 F.3d 523 (4th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

ii

*O.S. v. Fairfax Cty. Sch. Bd.*,
804 F.3d 354 (4th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*San Rafael Elementary Sch. Dist. v. California Special Educ. Hearing Office*,
482 F. Supp. 2d 1152 (N.D. Cal. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Sch. Dist. v. Schempp*,
374 U.S. 203 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Sherbert v. Verner*,
374 U.S. 398 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-29

*Stone v. Graham*,
449 U.S. 39 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Thomas v. Review Bd.*,
450 U.S. 707 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Wagner v. Bd. of Educ.*,
335 F.3d 297 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Zobrest v. Catalina Foothills School District*,
509 U.S. 1 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**STATUTES:**

20 U.S.C. § 1400(d)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 24

20 U.S.C. § 1401(29). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

20 U.S.C. § 1414(d)(1)(A)(i)(II)(bb). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**CONSTITUTIONAL PROVISION:**

U.S. Const. Amend. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Appellants, M.L. and his parents (collectively, "the parents"), reply to the Brief of the Appellees, Montgomery County Public Schools and its Superintendent (collectively, "the school system" or "MCPS"), as follows:

## INTRODUCTION

Appellees and their *amici* are defending the wrong appeal.  In arguing that the district court sufficiently protected M.L.'s right to a free appropriate public education ("FAPE") under the  Individuals with Disabilities Education Improvement Act ("IDEA") in its decision, they commit the same error as the court, confusing accommodation with education.  In essence, what they are pleading is that Montgomery County Public Schools did not discriminate against M.L. on the basis of his Orthodox Judaism, but rather afforded him access to the school system's general curriculum while offering him a number of accommodations in view of his religious beliefs.

It is the "wrong appeal" because we have never accused MCPS of discriminating against M.L., and certainly not intentionally.  This appeal has nothing to do with any allegation that MCPS has failed in its efforts to accommodate M.L.'s religious beliefs and those of his parents.  That is not what MCPS has failed to do.  What MCPS has failed to do is to *educate* M.L.  MCPS has literally abandoned any meaningful plan, "designed to meet [M.L.'s] unique

needs and prepare [him] for further education, employment, and independent living," 20 U.S.C. § 1400(d)(1)(A), and they have done so in the name of religious neutrality.

M.L. has a right to become an adult Orthodox Jew in Montgomery County, Maryland, as he and his parents desire. M.L. also has a right to a special education program that prepares him for that future life. What MCPS has literally lost sight of is that its general life skills curriculum – that program of studies that it argues is all that M.L. has a right to access – specifically contains all of the learning and experience that M.L. and his parents are seeking. In fact, the particular curriculum proposed by MCPS necessitates the consideration of M.L.'s family's needs and beliefs, as well as an intensive integration and involvement of the particular community in which M.L. will live. As demonstrated below, that Fundamental Life Skills ("FLS") curriculum, if faithfully implemented, will enable M.L. to become what he wants to be. In other words, it is what this family has always been seeking, if only the school system would really offer it.

And finally, in response more to appellees' *amici*, providing M.L. with that free appropriate public education which would enable him to learn as he wants to would do no damage to the First Amendment. Again, here there is another grave misunderstanding or misrepresentation. We certainly do not argue or believe that

2

there is a general right to state-sponsored religious education; there is no such thing.  But there is a right to appropriate *individualized* education under the IDEA which, for a few children such as M.L., can entail consistent and continual instruction in skills that the student will need in adulthood.  The Supreme Court has made it clear that, as long as those necessary special education services are provided regardless of religious or cultural belief, the First Amendment is secure.

The district court's decision denying the parents' motion for summary judgment should therefore be reversed.

## ARGUMENT

## I.    APPELLEES SUGGEST AN IMPROPER STANDARD OF REVIEW.

Appellees claim that the proper standard of review for this Court to apply to the district court's determination on the adequacy of M.L.'s IEP is one of "clear error."  Appellees Br. at 16-17.  They cite to *Cty. Sch. Bd. of Henrico Cty., Virginia v. Z.P. ex rel. R.P.*, 399 F.3d 298, 309 (4th Cir. 2005), in support of this proposition.  However, appellees are mistaken for three separate but related reasons: 1) a district court's determination of IEP appropriateness is considered a mixed question of law and fact in this jurisdiction; 2) *Z.P.* did not alter this standard; and 3) a *de novo* review of the district court's determination is called for

3

here because the district court held that M.L.'s IEP was adequate largely on the

*legal* conclusion that it was permissible to exclude religious and cultural content.

Though the standard of review of a district court's consideration of an IEP

has not always been clear, the balance – and the trend – of case law in this

jurisdiction holds that a district court's conclusion regarding an IEP is a mixed

question of fact and law to which the "clear error" standard does not apply.  The

leading case is *MM ex rel. DM v. School Dist.*, 303 F.3d 523, 530–31 (4th Cir.

2002), where this Court explained:

> In our review, we need not defer to factual recitations
> made by a district court from the administrative record,
> because that court stands in no better position than do we
> in reviewing the record. In conducting our review in an
> IDEA proceeding, we therefore must examine the entire
> record, and we must afford "due weight" to the
> administrative determinations, applying the standard of
> review utilized by the district court. However, where a
> district court has heard and considered additional
> evidence . . . we review its findings of fact for clear
> error.

 *MM*'s guidance in this regard has only been strengthened over the years.  *See J.P.*

*ex rel. Peterson v. Cty. Sch. Bd. of Hanover Cty., Va.*, 516 F.3d 254, 259 (4th Cir.

2008)  ("[w]hether a district court has accorded 'due weight' to the administrative

proceedings is a question of law—or at least a mixed question of law and fact—to

be reviewed *de novo* by an appellate court.") (citing *MM*, 303 F.3d at 530–31);

4

*A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 324–25 (4th Cir. 2004) (same); *JH ex rel. JD v. Henrico County Sch. Bd.*, 326 F.3d 560, 566 (4th Cir. 2003) (same); *G ex rel. RG v. Fort Bragg Dependent Sch.*, 343 F.3d 295, 302–03 (4th Cir. 2003) (same); *see also O.S. v. Fairfax Cty. Sch. Bd.,* 804 F.3d 354, 361 (4th Cir. 2015) (stating that the Court of Appeals applies the same standard of review as does the district court); *Lorenzen v. Montgomery Cty. Bd. of Educ.*, 403 F. App'x 832, 835 (4th Cir. 2010) (declining to apply the "clear error" rule).

Moreover, this Court did not alter the standard in *Z.P.*, the case cited by appellees. Rather, *Z.P.* acknowledged that there was "some tension" between the "clear error" standard and that of other Fourth Circuit cases. *Z.P.*, 399 F.3d at n. 7. Contrary to appellees' contention however, the Court expressly declined to resolve whatever tension might exist, noting, "[w]e need not, however, decide whether there is an actual (rather than merely semantical) difference between the standards of review set forth in *MM* and the clear-error cases, because any difference would not be relevant to our disposition of this case." *Id*. In other words, the Court in *Z.P.* declined to state the view that this jurisdiction follows a "clear error" rule. *See O.S.,* 804 F.3d at 361 (also declining to resolve the tension between the majority of the case law and the "clear error" rule cases).

5

Moreover, and as was the situation with *Z.P.*, regardless of which standard of review would apply in a typical case, it is clear from the facts and legal contentions of the parties here that any decision made by the district court on the adequacy of the proposed IEP implicated more than mere factual findings. In reality, the district court's opinion relied almost entirely upon its interpretation of the IDEA and First Amendment law. *See* JA 44-45. Such interpretations are subject to *de novo* review by this Court. *See AW ex rel. Wilson v. Fairfax Cty. Sch. Bd.*, 372 F.3d 674, 677 (4th Cir. 2004) ("This Court reviews the district court's interpretation of the IDEA *de novo*") (citing *Wagner v. Bd. of Educ.*, 335 F.3d 297, 301 (4th Cir. 2003)).

## II.    M.L.'S INDIVIDUAL NEEDS DRIVE HIS SPECIAL EDUCATION PROGRAMMING.

### A.    Appellees Ignore M.L.'s Unique Needs, Including His Inability to Generalize.

As a severely cognitively disabled Orthodox Jew, M.L. has unique needs quite different from almost all other students in MCPS. Unlike the great majority of MCPS students, he needs direct instruction of fundamental life skills during the school day. To accomplish this, the school system proposed placement for him in its FLS curriculum. JA 1119. And unlike the majority of Orthodox Jews, M.L. is

unable to distinguish what he learns at school and what he learns at home in order to be a functioning member of his Orthodox Jewish community.

This is because M.L. cannot learn and/or generalize skills across settings without *consistent repetition and reinforcement*. Though it has never been adequately considered by the Administrative Law Judge ("ALJ") or district court, JA 42, the record is replete with testimony – even from MCPS witnesses – that M.L. requires the same educational approach across settings or he will be unable to master the tasks before him. JA 353, 532, 619, 799-800. Several expert witnesses also testified that if M.L. is not given the consistent opportunity to generalize his skills across settings he could actually *lose skills* and regress in critical areas. JA 353. Once again, this is a major reason for MCPS to propose placement in a program using the FLS Curriculum, JA 1119; M.L. needs instruction in basic life skills in all settings in order to master these skills.

Appellees argue that courts have rejected that generalization of skills across settings is required to show educational benefit. But that is misleading. The case law they point to does not argue against M.L.'s claims here because none of the authorities address a situation where a student would make no academic gains in the classroom or at home were his need for consistency not addressed. Rather, these cases speak only of the IDEA's "some educational benefit" standard and

acknowledge, as they must, that if gains are accomplished in the classroom they need not necessarily translate to the home environment. *See Devine v. Indian River Cty. Sch. Bd.*, 249 F.3d 1289, 1293 (11th Cir. 2001) (rejecting that an IEP must create "more than just making measurable and adequate gains in the classroom."); *JSK By & Through JK v. Hendry Cty. Sch. Bd.*, 941 F.2d 1563, 1573 (11th Cir. 1991) (upholding a student's IEP due to classroom progress while noting that an IEP's adequacy is based on the "surrounding and supporting facts" and "must be determined on a case-by-case basis in the light of the child's individual needs"); *c.f. San Rafael Elementary Sch. Dist. v. California Special Educ. Hearing Office*, 482 F. Supp. 2d 1152, 1162 (N.D. Cal. 2007) ("a District is required to address behavioral problems extraneous to the academic setting only to the extent they affect the educational progress of the student"). Appellees' authority is simply inapposite.

Moreover, unlike appellees' authority, M.L.'s IEP implements the FLS curriculum which specifically emphasizes the need to reinforce and generalize skills across settings.[1] The curriculum stresses that, "for many students, generalization needs to be systematically planned. Simply exposing students to a variety of environments does not ensure competency in any of them. Repeated

---

[1]    The FLS curriculum is described in greater detail in Section II (B).

opportunities to practice skills in a specific setting, as well as instructional

strategies that are designed to meet the needs of the individual learner, are needed

in order to attain mastery." Attachment, p. 34.[2]  This emphasis, combined with the

opinions of those educators who have worked with and programmed for M.L. –

that he *requires* consistent instruction throughout his day and night – establishes

that his inability to generalize is not "irrelevant" but rather critical to meeting his

special education needs.

Appellees attempt to side-step this reality by arguing that their proposed

educational program would have been appropriate for M.L. if he were not an

Orthodox Jew, and that the school system is not obligated to address a student's

religious or cultural needs in his educational program.  Appellees' Br. at 21-22.

But M.L. *is* an Orthodox Jew and, try as they might, appellees have never pointed

to any authority stating that they *may ignore* these considerations when crafting

his educational programming.[3]  Indeed, the curriculum appellees chose for M.L.

---

[2]      Relevant pages of the FLS curriculum are included as an attachment
to this brief.

[3]      Appellees also provide no serious discussion of 20 U.S.C.
§ 1414(d)(1)(A)(i)(II)(bb), a portion of the IDEA requiring that a disabled
student's IEP academic and functional goals must, "meet each of the child's *other
educational needs* that result from the child's disability."  (*emphasis added*).
Appellees argue that, "if Congress intended this obscure statutory provision to
have such overwhelmingly broad reach, especially into areas that would

9

requires that the school system take exactly these types of considerations into account.

### B.     The Curriculum Proposed for M.L. Necessitates the Incorporation of his Cultural/Religious Practice.

Appellees argue that the IDEA ensures nothing more than that disabled children have access to the general education curriculum.  While appellants do not disagree that access to the general education curriculum is an important goal of the IDEA, it is crucial to recognize what this actually means.  In fact, despite routinely referring to the "general education curriculum" in its briefing, the school system has never described the version it proposed for M.L., the FLS curriculum.  There is a reason for this omission: the FLS curriculum *calls for precisely the type of instruction the parents have been requesting all along.*

It should come as no surprise that this curriculum requires the school system to take into account M.L.'s individual needs when designing his educational program.  The FLS curriculum contains numerous references to the importance of individualizing a student's educational program to his or her specific needs,

_____

potentially conflict with the Establishment Clause, it would have provided greater clarity."  Appellees' Br. at 31.  However, appellees provide no alternative interpretation of this section and despite the school system's dismissiveness, Congress did include it in the IDEA.  It is an operative part of the statute.

including the family's desires for the student, in order to prepare the student for life in the community.

The Introduction to the FLS curriculum guide outlines nine "principles of instruction," upon which the curriculum is based. These include:

- Instruction should occur in "natural environments" and at naturally occurring times of the school day whenever possible;

- Repeated practice in isolated skills in classroom settings *without connections to students' lives* will not be motivating and will not generalize to real life situations;

- Instructional priorities for each student should come *from real world needs of the individual students* to increase independence and autonomy *in his or her home and community*; and

- Parent participation in establishing instructional priorities is critical to IEP planning.

Attachment, p. 3 (emphasis added).

It is clear from these initial principles of instruction that MCPS recognizes the importance of learning and repeating skills in settings connected to students' lives to allow them to generalize skills. It is therefore critical to take into account students' real world needs when developing educational programs. Yet, MCPS has continually abandoned these principles of instruction when it comes to M.L.'s case. That departure from the foundations of FLS is all the more remarkable the

11

more one reads into the learning domains, goals, and methods outlined in the FLS curriculum.

Underpinning the FLS curriculum are five Learning Domains: Communication/Decision-Making/Interpersonal, Personal Management, Community, Career/Vocational, and Recreation/Leisure. Attachment, p. 4. These learning domains, "match the seven federal targeted aspects that define an integrated lifestyle. These aspects are: education, employment, social relationships; self-determination; recreation and leisure; neighborhood and community; and home." *Id*. Applying these, the FLS curriculum details various suggested instructional strategies, assessments and resources for each Learning Domain, as well as provides examples of what accomplishment of a goal in each area looks like.

For example, the curriculum describes the purpose of the study of personal management as, "the development of independence, interdependence, maintenance and *transmission of our cultural heritage* for the improvement of both self and society." Attachment, p. 5 (emphasis added). One goal within this domain is to eat independently/feed onself, and the FLS curriculum states that it can be accomplished by, "creat[ing] opportunities to practice eating a variety of foods across settings. For example, have students plan a meal and shop for (or bring in

12

foods), order lunch from the cafeteria and a variety of restaurants, have a picnic, ask parents if the class can come to their home to prepare a meal." Attachment, p. 6. Another goal within the domain, the goal of identifying one's own clothing, is accomplished by, "using an adapted writing overlay to have students write about their clothing. Students can describe the characteristics of their clothing and on what part of the body the clothing is worn." Attachment, p. 8.

As demonstrated above, the FLS curriculum's Learning Domains clearly require consideration of students' individual needs, such as their clothing or food choices. So for M.L., cooking a meal at his house involves following Kosher principles. Identifying his clothing means identifying the *yarmulke* and a *tzitzit* which M.L. wears every day. There is no other way to teach him.

The FLS curriculum also contains guidance regarding planning for instruction outside the classroom. Attachment, p. 17. Educational staff are directed to begin with a review of a student's academic needs: "focus should be on what supports will foster their independence and autonomy in the home and community." *Id*. The guide also outlines the process for the planning of instruction in the FLS curriculum:

- Take an inventory of student's learning strengths and needs with the family for independence and autonomy in home and community environments;

13

- Identify the desired outcomes using IEP goals and Alt-MSA objectives;

- Determine acceptable evidence of learning to maintain skills; and

- Plan learning experiences and instruction in natural environments during natural times of the school day.

*Id*. Based on its arguments to this Court, MCPS never evidenced any intention to follow this curriculum at Woodlin Elementary School ("Woodlin").

In developing its FLS curriculum, MCPS has recognized the importance of fostering a student's independence in the home and community. That is, MCPS must consider information regarding what a particular student needs to be independent in his or her home and community. Notably, the curriculum directs staff to confer with a student's family when formulating an educational plan.

The FLS curriculum's discussion regarding community-based instruction is also highly relevant. Community-based instruction is a vital part of the FLS curriculum, as the community is where students will eventually need to demonstrate the skills they learn through their education at school. In fact, discussion regarding M.L.'s ability to participate in the community-based instruction in the MCPS proposed program has been the focus of many of the parents' meetings with the school system.

14

MCPS emphasizes that the guidelines for community-based instruction are premised upon numerous principles and best practices for students with cognitive disabilities. Some of the principles include:

- Instruction should occur in 'natural environments' and at naturally occurring times of the school day whenever possible;

- Repeated practice in isolated skills in classroom settings without connections to students' lives will not be motivating and will not help them to generalize to real life situation;

- Instructional priorities for each student should be *based on the real world needs of the individual students, and should lead toward increased independence and autonomy in his or her home and community*; and

- Parents and professionals from different disciplines should collaborate in addressing the learning needs of students in multiple school and community settings.

Attachment, p. 23 (emphasis added).

The curriculum also emphasizes the importance of parental involvement. FLS educators are directed to,"take into account what family members view as important life skills for both current and future environments" when completing preliminary program planning for a student. Attachment, p. 25. The Curriculum provides specific direction regarding parent input:

Information should be solicited from the students' families regarding: places and types of recreation the family/student enjoys, where the family shops for food

15

and/or clothing, where they are likely to dine when they
go out to eat, and other services the family routinely
accesses in the community (*e.g.* post office, coin laundry,
public library, etc.). The purpose of gathering this
information is to help in identifying *meaningful sites and
activities* for community-based instruction.

*Id*. (emphasis added).

In identifying community sites, the Curriculum directs school staff to take

parental input into account. The Curriculum also instructs educators to identify

specific locations, "within *the students' communities*, or within the school

neighborhood." Attachment, p. 30 (emphasis added). The Curriculum describes

the types of community sites as shopping, dining, and recreational facilities. *Id*.

The Curriculum clearly recognizes the importance of ensuring that students

in FLS programs have the opportunity to practice skills in the natural settings

where those skills are typically used, *precisely what M.L.'s parents have been

requesting from the school system for their son*. The MCPS guide accurately

notes, "[l]earning takes place across a variety of environments; indeed, it must if

our students are to generalize what they learn. So, particularly for older

elementary and secondary students, instruction takes place not only in school

settings, but also in the community." Attachment, p. 24. MCPS clearly recognizes

the importance of providing instruction in students' natural environments due to

16

the difficulty students in an FLS program have generalizing skills between

different environments:

> Although at some times it is necessary to enhance
> instruction that would occur in the community by using
> simulated activities that do not occur in the natural
> setting, this is less desirable than naturalistic instruction.
> As educators we recognize that providing instruction in
> the naturally occurring situation greatly enhances the
> chances the student will generalize the skills and
> appropriately demonstrate these skills post-instruction.
> Simulated activities should always be tied to regularly
> scheduled opportunities to practice the skills addressed
> in the natural setting (i.e. the community).

Attachment, p. 33-4.

In sum, the FLS curriculum recognizes the importance of providing students

with community-based instruction in the environments in which they will live.

Community-based instruction is, "an integral part of the curriculum for students

with cognitive disabilities, and is crucial in order to achieve the long-range

outcome of preparing each student for life as an adult in which he/she is a full

participant in society."  Attachment, p. 37.  The Curriculum encourages that,

"properly implemented, community-based instruction will make the difference for

our students between a rich, meaningful and fulfilling life, and an adulthood of

isolation, boredom and purposelessness."  Attachment, p. 38.

Using the school system's own words, in order for M.L. to have "a rich, meaningful, and fulfilling life," he needs instruction in his community to prepare him for an adult life where he will live. Without this instruction, M.L. will lead an adult life apart from his community and be at an unacceptable risk of, "isolation, boredom, and purposelessness."

## III. APPELLEES' PROPOSED ACCOMMODATIONS DO NOT PROVIDE M.L. THE EDUCATION TO WHICH HE IS ENTITLED.

Appellees argue that they would have provided accommodations to M.L. if he had attended the proposed MCPS program at Woodlin. While we do not doubt this, a focus on accommodations is relatively unhelpful. That is, if MCPS had confronted M.L.'s cultural and religious identity through accommodations alone, that would not have provided the education to which he is entitled. This is because appellees have overlooked a central tenet of the parents' argument since the IEP process began: the inevitable result of the "accommodations" provided to M.L. in the FLS program at Woodlin would have been to unreasonably impact his education and deny him a FAPE. Removal of activities offensive to M.L.'s religion or culture would merely serve to withhold needed instruction. Accommodation is not education.

18

There are many examples of appellees missing the importance of this distinction. For instance, appellees focus on examples of accommodations for minor events, such as Lisa Davisson's testimony regarding the accommodations MCPS provides to students who do not observe Halloween. Appellees' Br. at 11. As Ms. Davisson explained, during the Halloween parade at school, students who did not celebrate the holiday participated in story time at the library, an activity unrelated to Halloween. *Id*. Appellees also point to Ms. Davisson's testimony about how the school system would accommodate for M.L.'s dietary restrictions during cooking class or community trips. Appellee's Br. at 12.

But appellees never acknowledge, let alone address, the cumulative impact the constant need for "accommodation" would have on M.L.'s education. As the parents described at hearing and throughout this litigation, M.L. would be unable to participate in many important components of the FLS curriculum, such as cooking classes or field trips. He would also be unable to attend many community field trips, such as visiting McDonald's, where FLS students go to practice buying and ordering items, and he would be unable to participate in the cooking lessons. JA 58-61, 75-76. Given the importance placed on these life skills by the FLS curriculum, *supra* section II(B), and that students must participate in the actual

events in order to receive the benefit of the instruction,[4] there is no way to

"accommodate" M.L.'s culture and religion and still provide instruction.

At the due process hearing, MCPS witnesses certainly recognized the

deleterious effect of M.L. not being able to participate in certain aspects of the

curriculum.  When asked about the consequences if M.L. could not participate in

field trips or cooking lessons in the MCPS program, Brenda Browne observed,

"Yeah, you can't learning [*sic.*] anything when you're not there."  JA 805-806.

If alternate activities and instruction were appropriate for M.L., or sufficient

for him to learn necessary life skills, MCPS would obviously not have proposed a

program requiring a substantial amount of direct life skills experiences, including

cooking classes and community trips to grocery stores or restaurants.  If M.L.

could learn these skills through classroom activities, such as measurement lessons

or reading social stories, MCPS could have and would have proposed a program

for him with vastly different instruction.

And the truth is, despite the arguments in its briefs about accommodating

M.L. if he had attended an MCPS program, the school system repeatedly refused

to accommodate M.L. by adding requested goals to his IEP that were not overtly

---

[4]      As John Dewey famously remarked, "Education is not preparation for
life.  Education is life itself."  That forms the basis of the Fundamental Life Skills
curriculum.

20

religious. Jennifer Engel Fisher testified regarding various IEP goals that the parents had requested be added to M.L.'s IEP, including goals for elapsed time and measuring/cooking. JA 314-318. MCPS denied all of these requests by the parents.

Finally, it is even unclear what exactly MCPS means when it says it would accommodate M.L.'s culture and religion. It appears that by "accommodating" students' religious needs, MCPS is nonetheless getting involved in religious instruction anyway, in some respects in precisely the way that the school system has continually argued it cannot. For example, Ms. Davisson testified regarding accommodating another Orthodox Jewish student in a life skills classroom. JA 612-613. If that class were completing a cooking activity in which students had to create a sandwich and choose between various meats to include – and one of the options was a pork item which the teacher knew the student was not permitted to eat – would the teacher not remind him not to choose that option? Such a situation certainly crosses the line between accommodating M.L.'s desire to "opt out" of an activity and into the realm of actually instructing him. Or, if a student in a life skills program needs to pray at a particular time every day, would MCPS staff remind him? Would they formulate his schedule to allot for this time every day?

Surely, students with low cognitive functioning who are placed in functional life skills programs need reminders from educational staff to complete certain tasks or not to choose particular food items. *If they were able to generalize these types of ideas and skills between home and school, they would not be placed in a life skills curriculum.* MCPS seems to be arguing that this type of accommodation is permissible and that the school system is actively providing these types of accommodations for students. However, providing these types of "accommodations," which ensure students do not participate in any activities that infringe upon their religious beliefs, requires MCPS to get involved with a particular religion to some degree.

## IV.    APPELLEES AND THEIR *AMICI* SWEEP TOO BROADLY: THE PROVISION OF RELEVANT SPECIAL EDUCATION TO A PROFOUNDLY DISABLED STUDENT DOES NOT THREATEN THE FABRIC OF THE FIRST AMENDMENT.

Whether they purport not to take a position on what special education services would benefit M.L., Am. United Br. at 2., or seek to minimize, "the obligations on school districts to address every need that a child with disabilities may have," NSBA Br. at 2, appellees and their *amici* make the consistent, overarching error of ignoring the specific facts and controlling circumstances individual to M.L. They sweep much too broadly in attempting to make this case

22

a question of the limits of the First Amendment and the dangers of government interference with religion. In truth, this case presents none of these concerns. Rather, this Court is only asked to decide what special education M.L. requires in order to become a productive member of his community. M.L.'s extensive disability and status as an Orthodox Jew may have rendered such a decision more complicated, but the question remains unchanged.

### A.     Invoking the First Amendment Does not Relieve the Requirement to Consider M.L.'s Individual Circumstances.

Appellees and their *amici* expend much effort attempting to convince this Court that allowing M.L. to receive special education instruction that accommodates and reinforces his cultural and religious identity will cause irreparable damage to the fabric of the First Amendment. But M.L. is not any, many, or most students. He is not even one of a small minority of students. Rather, his combination of disability and identity is the rarest of rare: a profoundly disabled student who is also a devout member of the Orthodox Jewish culture and religion. In attempting to focus on the latter, appellees and their *amici* strip away M.L.'s disability. But this case cannot be understood without it.

For example, as we have previously detailed, essential to determining what special education M.L. requires is understanding that he cannot generalize skills

23

across settings without *consistent repetition and reinforcement*.    JA 353, 532,

619, 799-800.  Appellees and their *amici* reverse the argument when they write,

"[o]nce it is determined that no right to such IEP goals and objectives exists, the

question of M.L.'s alleged inability to generalize skills from his school to his

Parents' Orthodox Jewish community becomes irrelevant under the IDEA . . ."

Appellees Br. at 33.  But M.L. does not have a right to have cultural and religious

content in his schooling because of the First Amendment; rather he has the right to

have such content because he has a disability and "unique needs" in

generalization.  20 U.S.C. § 1400(d)(1)(A); 20 U.S.C. § 1401(29).

**B.    Stop the Parade: The Question of *How* to Effectively Provide M.L.'s Religious/Cultural Instruction is Independent From the Court's Obligation to First Determine M.L.'s *Need* for Such Instruction.**

After ignoring the specific factual circumstances that have made it

necessary for M.L. and his family to challenge the proposed IEP, appellees and

their *amici* have attempted to construct a parade of horribles that would surely

befall MCPS – and every school system – should this Court grant M.L. the special

education he needs to become a functioning member of his community.

Specifically, *amici* Americans United, *et al.* claim that recognizing M.L.'s unique

needs in this case will jeopardize religious liberty for all individuals, Am. United

24

Br. at 19, relying in large part upon the writings of Roger Williams in 1644 and Thomas Jefferson in 1779, none of which of course had anything to do with education or disability. *Amici* further assert that meeting M.L.'s needs would require MCPS to determine and interpret religious controversies, including which Kosher symbols are correct, with "deciding theological questions [] becom[ing] the essential function of school officials who develop and implement educational programs for students with disabilities." Am. United. Br. at 26, 28.

But such clearly overreaching arguments make little sense here. This case does not implicate unjustifiable and unnecessary religious establishment statements such as posting the Ten Commandments in a public school classroom, *see Stone v. Graham*, 449 U.S. 39 (1980), or beginning the day for all students in a public school with a Bible verse reading. *See Sch. Dist. v. Schempp*, 374 U.S. 203 (1963). This is about one student, his individual disability, and the "unique needs" that must be affirmatively addressed under a comprehensive federal civil rights law.

More fundamentally, however, even if the practical concerns of how to provide the instruction matter, appellees and their *amici* have started their parade too soon. The central province of this Court is to decide *if* M.L. requires instruction that includes the religious and cultural elements of the community

25

MCPS is ostensibly preparing him to join. As stated above, that means examining M.L., his disability, his educational curriculum, his IEP, and deciding, based upon the IDEA and Maryland regulations, whether the content of his instruction must include his religious and cultural identity.

Such a case by case decision comes before the practicalities of its implementation. Indeed, appellants respectfully suggest that this Court should *not* attempt to define exactly how M.L.'s cultural and religious instruction can best be integrated into his MCPS-sponsored IEP. Should this Court rightly conclude that M.L. requires these services, the *Burlington*/*Carter* tuition reimbursement remedy is sufficient to immediately correct the wrong visited upon him by the school system's past refusals.[5] And if appellees' *amici* are correct that augmenting his IEP to include the needed services may require additional fact-finding – a position

---

[5] Appellants have consistently argued that the Supreme Court's opinions on education and religion support their claims and provide the roadmap for their implementation. *See Agostini v. Felton*, 521 U.S. 203 (1997) (assisting parochial students under Title I of the Elementary and Secondary Education Act); *Board of Educ. of Kiryas Joel Village School Dist. v. Grumet*, 512 U.S. 687, 690 (1994) (acknowledging, "that in commanding neutrality the Religion Clauses do not require the government to be oblivious to the impositions that legitimate exercises of state power may place on religious belief and practice."); *Zobrest v. Catalina Foothills School District*, 509 U.S. 1 (1993) (assisting parochial students under the IDEA).

we do not endorse – the district court is nonetheless in the best position to take additional documentary and testimonial evidence to render such factual findings.

In sum, the distracting constitutional arguments of appellees and their *amici* reverse the order of the issues properly before this Court. Once the Court has determined whether M.L. requires special education in the areas identified, only then is the question of implementation reasonable. To do otherwise conflates both analyses, injecting unnecessary considerations too removed from the IDEA's purpose, procedures, and substantive requirements.

## V. MCPS UNCONSTITUTIONALLY CONDITIONS THE PROVISION OF A FAPE ON M.L. AND HIS PARENTS FOREGOING THE PRACTICE OF THEIR RELIGION.

As we have already extensively discussed, M.L.'s inability to generalize skills across settings drastically affects the "script" that he must be taught. Appellees and their *amici* claim that refusing to incorporate needed instruction in M.L.'s functional goals does not constitute an unconstitutional condition because, in their view, M.L. does not have a right under the First Amendment to alter the public school curriculum to suit his individual needs. Am. United Br. at 7-8. While we certainly contest that the IDEA or the First Amendment countenances ignoring M.L.'s need for consistency of instruction, it is also important to highlight that appellees and their *amici* erroneously ignore the effect the MCPS

27

policy has on M.L.'s parents. In other words, even if there were no
unconstitutional condition applied to M.L., the MCPS policy does
unconstitutionally restrict M.L.'s parents.

M.L. and his parents have consistently argued below that by refusing to
support M.L.'s needs during the school day, the parents have been put in the
unconstitutional position of having to forego the practice of their religion and that
of M.L. in the home environment or risk confusing him to the degree that he will
never understand what script he is to follow. This is because if M.L.'s parents
exercise their and M.L.'s religion in the home environment, as everyone would
agree is their and M.L.'s right, M.L. would effectively *unlearn* what he is being
taught during the school day. JA 231, 241, 353, 831. The school system's
response to M.L.'s unique cognitive and generalization deficits therefore creates
an unconstitutional condition on the receipt of a federal benefit: accept the "free"
in FAPE and forego their religious and cultural practice, or surrender the "free"
merely so they can do what the First Amendment guarantees every American by
right. *See, e.g. Thomas v. Review Bd.*, 450 U.S. 707, 717-18 (1981) (recognizing
an unconstitutional burden on religion when the state conditions benefits upon
"conduct proscribed by religious faith."); *Sherbert v. Verner*, 374 U.S. 398,

403-06 (1963) (holding a denial of government benefits unconstitutional because of pressure to forgo religious practice).

## CONCLUSION

For the aforegoing reasons, as well as those states in the appellants' principal brief, the district court's decision should be reversed.

Respectfully submitted,

/s/ Michael J. Eig
Michael J. Eig
Paula A. Rosenstock
MICHAEL J. EIG AND
ASSOCIATES, P.C.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740
Counsel for Appellants

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

        this brief contains <u>6,193</u> words, excluding parts of the brief exempted by Fed R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

        This brief has been prepared in a proportionally spaced typeface using <u>14 Point Times New Roman</u> in <u>WordPerfect 12</u>.

                      /s/ Michael J. Eig

                      Michael J. Eig

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this, the 26th day of April, 2016, I electronically filed the foregoing brief with the Clerk of Court using the CM/ECF System, which will sent notice of such filing to all registered CM/ECF users.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Karen R. Taylor

Karen R. Taylor

GIBSON MOORE APPELLATE SERVICES, LLC

P.O. Box 1460

Richmond, VA  23218

(804) 249-7770
